UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
KAREN CAMERON and SYLVIA                                    06-CV-7798 (PAC)
HIGGENBOTTOM,

                              Plaintiffs,

          - against –                                    Defendants' Motions in Limine

THE CITY OF NEW YORK, CARMEN RAMOS,
ANGEL RIVERA, SERGEANT PETERSON, and
JOHN and JANE DOES,                                        **BY ECF**

                              Defendants.
------------------------------------------------------------------X


**Defendants' Motion to Dismiss the Municipal Liability Claims, Defendants' Motions in Limine and Defendants' Opposition to Plaintiffs' Motions in Limine**

Defendants City of New York, Carmen Ramos, and Angel Rivera,[1] by their attorney, Michael A. Cardozo, Corporation Counsel of the City of New York, hereby submit the following for their Motion to Dismiss Plaintiffs' Monell Claims, their Motions in Limine and their Opposition to Plaintiffs' Motions in Limine.

## POINT I

### THE CITY IS ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' FEDERAL CLAIMS

As stated in their Proposed Jury Charge of September 3, 2008, plaintiffs' claim against the City is as follows:

---

[1] Plaintiffs have agreed to the dismissal of all claims against Norman Peterson s/h/a Sergeant Peterson.

## FEDERAL LIABILITY AGAINST THE CITY OF NEW YORK

70. Ms. Cameron and Ms. Higgenbottom also seek to hold the City of New York liable for the violation of their federal constitutional rights. I instruct you that the fact that an employee of a governmental entity like The City of New York deprived either of them of a federal right is not alone a sufficient basis for holding the City liable to the plaintiffs. Before you can hold the City liable, Ms. Cameron and Ms. Higgenbottom must establish by a preponderance of the evidence that the action of the employee or employees which deprived them of their federal right was the result of an official policy or practice of the municipality or a governmental custom, even though such a custom has not received formal approval through the body's official decision-making channels. Thus, before you can hold the municipality liable, you must be convinced that the acts in question were officially sanctioned or ordered by the municipality (Auth: Sand 87-81).

71. There is no requirement, however, that the action was taken pursuant to a long-standing or regularly applied policy of the municipality. A government frequently chooses a course of action tailored to a particular situation. Even if you determine that the particular policy or practice was established for a single occasion, you may still find that it represented an official policy of the municipality, provided that a deliberate choice to follow a course of action was made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question (Auth: Sand 87-81).

72. Ms. Cameron and Ms. Higgenbottom contend that the City failed to appropriately supervise and discipline defendant Ramos. More specifically, they allege that the City knew that officer Ramos's behavior toward citizens was a potential problem and failed to take the steps necessary to insure that her conduct as a member of the police department did not violate plaintiffs' constitutional rights. Whether an official practice or custom exists is a question of fact for you to decide. A practice or custom is a persistent, widespread course of conduct by municipal officers that has become a traditional way of carrying out policy, and has acquired the force of law, even though the municipality has not formally adopted or announced the custom (Authority: Sand 87-83).

Plaintiff's Proposed Charge of September 3, 2008.

Plaintiffs' deliberate indifference claim against defendant City fails as a matter of law.[2] The Second Circuit has reiterated that, in order to proceed to trial on a deliberate indifference claim, plaintiffs are required to submit actual evidence establishing that a policymaker knew to a moral certainty that municipal employees would confront a given situation, that the situation presented the employees with a difficult choice or there was a history of its mishandling of the situation, and that the wrong choice by the employees would frequently cause the deprivation of citizens' constitutional rights.  Reynolds v. Giuliani, 506 F.3d 183, 192 (2d Cir. 2007) (citing Walker v. City of N.Y., 974 F.2d 293, 297-98 (2d Cir. 1992)).

In Reynolds v. Giuliani, the Court noted that, where there is evidence that the defendant responded to the given situation at issue, plaintiffs "faced a heavy burden of proof in showing that the [defendant's] response was so patently inadequate to the task as to amount to deliberate indifference."  Reynolds, 506 F.3d at 192-93.  Moreover, in determining whether a municipality is deliberately indifferent, the extent of defendants' ultimate success in preventing constitutional violations "cannot be the legal measure of its efforts to do so."  Id. at 196.  Thus, even if a court or jury were to determine that Officer Ramos's actions were unconstitutional in this instance, defendant City cannot be held liable on a deliberate indifference theory because of the attempts defendant City has taken to supervise and discipline Officer Ramos.

---

[2] To the extent plaintiffs' argue, in their paragraph 71, that one incident can form the basis of municipal liability, such an argument would only be viable if a final policymaker made a decision in this incident such that policy was created.  See Oklahoma v. Tuttle, 471 U.S. 808 (1985) (one incident does not rise to the level of municipal policy or municipal liability unless undertaken by a final policymaker); Pembaur v. City of Cincinnati, et al., 485 U.S. 469 (1986) (County Prosecutor held final policymaking authority on the subject matter at issue; thus his decision to have sheriffs break down door to doctor's office was policy of municipality).  This case certainly did not involve the final policymaker here, the Commissioner of the New York City Police Department.

The Reynolds plaintiffs claimed that the state defendants were deliberately indifferent to plaintiffs' due process rights because they failed to properly oversee the City's administration of a state welfare benefits program.  There, the Second Circuit determined that plaintiffs could not prove that the "supervision was patently inadequate," thus declining even to address whether "any hypothetical inadequacies" in the defendants' response could be linked to plaintiffs' injury such that the Walker test could ever be satisfied.  Id. at 195.  In so holding, the Court relied upon evidence that the defendants had taken various measures to attempt to correct the circumstances that led to plaintiffs' allegations of unconstitutional conduct, notwithstanding the fact that the District Court found that those measures proved to be unsuccessful.  Id. at 195-96.  Thus, even inadequate responses by a municipal defendant stand "in sharp contrast to the allegations of inaction and even encouragement of misconduct" required to sustain a deliberate indifference claim.  Id. at 196.

Here, as in Reynolds, defendant City did not "sit on their hands in the face of an obvious need to act." Id.  Officer Ramos was trained by NYPD and when complaints about her conduct were made, NYPD took steps to correct wrongdoing and discipline Officer Ramos for her actions.  For instance, in CCRB Complaint 9904306, the complainant alleged that on September 12, 1999, he was pulled over as part of a routine "grand larceny auto" checkpoint, and was approached by Officer Ramos. Officer Ramos and the complainant became involved in an argument when he insisted that he needed to get out of his car in order to produce his identification.  He claimed that he could not reach into his back pocket because of a shoulder injury.  The complainant alleged that Officer Ramos detained him, that she threatened to arrest him, that she did not provide her name to him, that she spoke rudely and obscenely to him, and that she made remarks to him based on his ethnicity.  The CCRB found that the complainant was more credible that Officer Ramos and substantiated the allegation that she detained the

complainant. Officer Ramos denied handcuffing the complainant but the complainant and other officers testified that she did. Officer Ramos was exonerated on the allegation that she threatened to arrest him and the remaining allegations were unsubstantiated. The CCRB recommended Command Discipline for Officer Ramos for detaining the complainant and the officer was disciplined.

In CCRB Complaint 200305728, the complainant filed a complaint against Officer Ramos and other officers on July 28, 2003. With respect to Officer Ramos, he alleged that a month earlier, on June 28, 2003, Officer Ramos refused to provide her shield number (this allegation was closed as unsubstantiated), swore at him and called him a racial epitaph while transporting him from the scene of the arrest to the stationhouse. Finding the complainant more credible than Officer Ramos, the CCRB panel substantiated charges of discourtesy and offensive language against her and recommended charges. Officer Ramos was brought up on departmental charges of being wrongfully discourteous in violation of Patrol Guideline 203-10 and of wrongfully using offensive language in violation of Patrol Guideline 203-10, and on February 8, 2005, following a department hearing was found not guilty of the charges.

In CCRB Complaint 200000281, the complainant alleged that on December 21, 1999, he encountered Officer Ramos when she responded to a vehicle accident involving a livery car owned by him. Though he was not the driver, he tried to provide an account of the accident. Officer Ramos repeatedly asked him not to become involved. Ultimately, the complainant was arrested and released with a disorderly conduct summons. He filed complaints with the CCRB against Officer Ramos alleging that she wrongfully issued a summons to him, that she was rude to him and that she made remarks to him based on his ethnicity. The CCRB exonerated Officer Ramos on the allegation that she wrongfully issued a summons because the complainant's behavior was disorderly in that he congregated with others and refused to comply with a lawful

order to disburse.  The CCRB found that the allegation that she used a discourteous and rude tone was unsubstantiated because a forceful tone may have been an appropriate reaction on her part, and the evidence was inconclusive whether she spit in the direction of the complainant.  The panel substantiated the allegation that Officer Ramos made remarks to the complainant based on ethnicity and recommended Command Discipline.

Rather than impose Command Discipline, Officer Ramos was brought up on departmental charges for offensive and derogatory ethnic remarks in violation of Patrol Guideline 104-01 and for spitting in the direction of the complainant in violation of Patrol Guideline 104.01.  Following a department hearing in December 2001, Officer Ramos was found not guilty of both charges.

As the Court can see, the NYPD has taken a strong stance in its discipline of Officer Ramos.  As the Court is also aware, the substantiated complaints against Officer Ramos have more to do with discourtesy than unlawful behavior on her part.  And, in fact, there are no allegations in this case that Officer Ramos used offensive language or was discourteous to plaintiffs Cameron and Higgenbottom.  Where, here, as in Reynolds, the most plaintiffs can show is that defendant's attempts to supervise have proved less 100% effective, the Second Circuit has made it perfectly clear:  that evidence cannot defeat summary judgment on a claim of municipal liability.  Therefore, the federal claims against the City must be dismissed.

**POINT II**

**THE JURY DOES NOT NEED TO KNOW THAT
THE CITY IS A DEFENDANT IN THIS CASE**

If the City's motion for dismissal of the Monell claim is granted, then the City should not be mentioned as a defendant at this trial.  Under state law, the City's liability, if any, will be pursuant to *respondeat superior*.  Defendants have not argued that the officers were acting outside the scope of their employment at the time of the incident.  There are no issues of fact to

be decided by the jury on this claim: it will be determined as a matter of law by the Court if there is a verdict against one or both of the defendants. Without the necessity of jury deliberations on the issue, there is no need for them to know that the City is a defendant in this case.

On the other hand, if the jury does know that the City is a defendant, there is always the chance that the jury may decide the issues in this case, even subconsciously, on grounds having nothing to do with the facts of the case. The prejudice to the individual defendants is immeasurable. In considering this issue under FREs 402 and 403, the fact that the City is a defendant is not relevant to determining the facts of this case and that, to the extent it is relevant, the considerations of FRE 403 weigh in favor of precluding the mention of the City of New York as a defendant at this trial.

## POINT III

### DEFENDANTS OPPOSE PLAINTIFFS' MOTION TO PRECLUDE THE TESTIMONY OF THE ADAs IN THIS MATTER

On the date of the arrests, ADA Brandon made decisions about whether to go forward with criminal prosecutions of the arrestees and, in fact, declined to prosecute Ms. Higgenbottom while deciding to go forward with the criminal prosecution of Ms. Cameron. The ADA also changed some of the arrest charges when determining on what charges the ADA would go forward. At a later time in the prosecution, ADAs Pangilinan and Saeone[3] viewed the surveillance video and determined to continue with the criminal prosecution. All of these decisions were made by the DA's Office and not by the officers.

---

[3] In the JPTO, plaintiffs argue that defendants should be precluded from calling ADAs Pangilinan and Saeone because their names were not disclosed in discovery. In fact, their names were listed on defendants' 26(a) disclosures of January 23, 2007.

"The first element of a malicious prosecution cause of action, under state law or § 1983 is, … 'that the defendant initiated a prosecution against the plaintiff.'"  Rohman v. New York City Transit Auth., 215 F.3d 208, 217 (2d Cir. 2000) (quoting Posr v. Court Officer Shield #207, 180 F.3d 409, 417 (2d Cir. 1999)).  "'Initiation' in this context is a term of art" that involves more than reporting a crime or giving testimony.  Rohman, 215 F.3d at 217; Present v. Avon Products, Inc., 253 A.D.2d 183, 189, 687 N.Y.S.2d 330, 335 (1st Dep't 1999).  Similarly, showing that the defendant maintained or provided documents that are instrumental to filing of criminal charges does not meet the initiation element.  Pritzker v. City of Hudson, 26 F. Supp. 2d 433, 442 (N.D.N.Y. 1998); Present, 253 A.D.2d at 189, 687 N.Y.S.2d at 335 (defendant must do more than present material facts to prosecutor).  In fact, initiation involves playing "an active role in the prosecution, such as giving *advice and encouragement or importuning* the authorities to act."  Rothstein v. Carriere, 373 F.3d 275, 294 (2d Cir. 2004) (internal quotations omitted) (citations omitted) (emphasis added).

With respect to this prong, government officials are not held to a heightened standard.  Rohman, 215 F.3d at 217 (a government employee does not initiate a criminal proceeding by merely reporting the crime or giving testimony); White v. Frank, 855 F.2d 956, 962 n.6 (2d Cir. 1988) ("we have assumed in the past that police officers are subject to liability for malicious prosecution as any other defendant would be, assuming of course that the high standard of liability is met").  Police officers, like private citizens, therefore, must do more than report facts and events to the public prosecutor in order to be considered to have initiated the criminal prosecution.  As the Seventh Circuit has noted, "in order to state a claim for malicious prosecution against the police officers under § 1983, [the plaintiff] must do more than merely claim that they arrested and detained him without probable cause. … [R]ather, he must allege that the officers committed some improper act after they arrested him without probable cause

….." Snodderly v. R.U.F.F. Drug Enforcement Task Force, 239 F.3d 892, 901 (7th Cir. 2001). However, filing an affidavit charging the plaintiff with a crime does not amount to an initiation of prosecution. Snodderly, 239 F.3d at 901 & n.10.

Moreover, the principal player in carrying out a prosecution is not the police officer but the prosecutor. See Snodderly, 239 F.3d at 901 ("a malicious prosecution action against a police officer is 'anomalous,' because the State's Attorney, not the police, prosecute a criminal action") (internal citations omitted). Consequently, "the availability of the malicious prosecution action has been curtailed with the growth of the office of the public prosecutor." White v. Frank, 855 F.2d at 962. The judgment of a prosecutor to pursue an action "may decrease the likelihood that a complaining witness will be considered to have 'caused' or 'procured' the prosecution, thus defeating grounds for liability under this initial prong of the common law standard." Id.; William Williams v. City of New York, 02 CV 3693, 2003 U.S. Dist. LEXIS 19078, at *18-19 (S.D.N.Y Oct. 23, 2003)(Judge Motley reiterating, "once a criminal defendant has been formally charged, the chain of causation between the officer's conduct and the claim of malicious prosecution is broken by intervening actions of the prosecutor, thereby abolishing the officer's responsibility for the prosecution." (citing Townes v. City of New York, 176 F.3d 138, 147 (2d Cir. 1999)). Thus, to sustain a claim for malicious prosecution, the plaintiff must show that the defendant police officer did more than file a criminal complaint. Plaintiff must show that the defendant manufactured evidence that influenced the decision to prosecute, actively encouraged a baseless prosecution, or provided information to prosecutors that was maliciously false. White, 855 F.2d at 962.

In light of the foregoing, it is difficult to conceive of a witness who has *more* relevant knowledge relating to the plaintiff's malicious prosecution claim than the ADAs. Because it was

their prosecution, the ADAs will be able to state *facts* about the reasons for prosecuting the plaintiff, and the course of the criminal proceeding.

Under the reasoning in plaintiff's in her motion in limine, citing Ricciuti v. New York City Trans. Auth., 124 F.3d 123 (2d Cir. 1997), White v. Frank, 855 F.2d 956 (2d Cir. 1988) and Malley v. Briggs, 475 U.S.335 (1986), plaintiff argues that defendants are not entitled to assert that they did not initiate the prosecution because plaintiff alleges that the officers lied to the ADA. [Plaintiffs' Motions In Limine ("Ps' MIL") A, p.4]  That argument puts the cart before the horse.  Plaintiff's allegation is to be decided by the jury; it is not an established fact that precludes defendants from proving that the DA, and not the officers, made all the decisions regarding the initiation or continuation of the prosecution.  Therefore, the first element of the malicious prosecution is either a material issue of fact for the jury or should be decided by the Court as a matter of law, the ADAs' testimony is relevant, and it should be elicited at trial.

## POINT IV

## THE CCRB INVESTIGATION OF THIS INCIDENT

With respect to plaintiffs' motion regarding the exoneration of the defendants by CCRB [Ps MIL, B, p.4], defendants contend that the fact that plaintiff complained to CCRB, the fact that CCRB investigated the complaint, and the fact that CCRB exonerated the defendants are not relevant to the determination of the facts in this case.  Only the sworn statements taken by the CCRB investigators should be allowed at this trial, subject to adherence with the Federal Rules of Evidence and the Federal Rules of Civil Procedure.   All properly certified transcribed testimony before the CCRB should be used at trial as appropriate.   Defendants suggest that all sworn testimony from CCRB be referred to as "sworn testimony of [date]" when referred to at trial or in examination of the witnesses so that references to the CCRB investigation will be avoided and unfair prejudice to either side sill also be avoided.

## POINT V

### TESTIMONY OF DEFENDANTS' EXPERT

Plaintiffs move to preclude the testimony of Dr. Eric Goldsmith, claiming that defendants (1) failed to turn over a document upon which Dr. Goldsmith relied and (2) failed to complete a privilege log for the document. Defense counsel advised plaintiff's counsel that, in forming his expert opinion, Dr. Goldsmith did not rely upon the document withheld. Defense counsel also advised plaintiff by letter of September 3, 2008, why the document was being withheld. A formal privilege log was not necessary because the document viewed in conjunction with the letter from defense counsel put plaintiff on notice of all information required under the Federal Rules of Civil Procedure.

However, defendants are turning over the document to avoid any potential issue n this matter. Therefore, this matter should be moot, and the doctor should be permitted to testify at trial.

## POINT VI

### OFFICER RAMOS'S DISCIPLINARY HISTORY

Defendants seek to prohibit any reference to Officer Ramos's disciplinary history. From a reading of plaintiffs' portion of the pre-trial order and their proposed jury charge it appears that plaintiffs intend to offer Officer Ramos's disciplinary records to prove municipal liability solely to prove municipal liability. As argued supra, the federal claims against the City should be dismissed. However, if the plaintiffs also intend to use the records to prove their claims against the individual officers, that attempt would be barred under the Federal Rules.

Rule 404(b) of the Federal Rules of Evidence prohibits the use of evidence of past acts "to prove the character of a person in order to show action in conformity therewith." Rule 404(b) only permits the use of evidence of past acts for "proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident." Additionally, Rule 403 of the Federal Rules of Evidence states that relevant evidence "may be excluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Therefore, any proposed evidence of allegations or discipline taken against Officer Ramos should be precluded from evidence at trial because such evidence may not be used to show the likelihood of action in conformity therewith. Such evidence of subjective motivation is more prejudicial than probative, and is irrelevant to the issues at this trial.

Additionally, if plaintiff were allowed to question Officer Ramos about past allegations and discipline, the jury could choose to punish the defendant for prior acts rather than the acts alleged here, or infer misconduct here by the fact that prior complaints have been filed. See Huddleston v. United States, 485 U.S. 681, 686 (1988) ("The [offering party] may not parade before the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo.") This is the very type of prejudicial evidence that Rule 403 and 404(b) prohibits from being introduced into evidence. Huddleston, 485 U.S. at 686.

In Berkovich v. Hicks, 922 F.2d 1018, 1022 (2d Cir. 1991), the Court found that the district court did not abuse its discretion in not admitting evidence of prior civilian complaints in an excessive force action:

> Berkovich first contends that the prior complaints showed Hicks' 'sadistic,' 'malicious,' 'aggravated state of mind.' This proffer amounts to no more than a veiled attempt to do what Rule 404(b) expressly prohibits—introducing evidence of bad acts to show the defendant's propensity to commit such acts.

The Second Circuit then distinguished Ismail v. Cohen, 706 F. Supp. 243 (S.D.N.Y. 1989), often cited by parties wishing to discover and admit evidence of prior disciplinary allegations and history:

> Berkovich next argues that the prior complaints should have been admitted to establish a pattern of conduct by Hicks. To merit admission under this theory, the extrinsic acts must share 'unusual characteristics' with the act charged or represent a 'unique scheme' [case omitted]. Assuming that allegations of the seven prior complaints could be proved, they do not show the kind of *modus operandi* claimed in this case. Berkovich buttresses his argument by relying upon Ismail v. Cohen, a section 1983 action in which we affirmed the district court's admission of a subsequent complaint issued against the defendant police officer. In Ismail, however, the complaint arose under nearly identical circumstances to the incident for which the defendant was then on trial. [citation omitted] No such pattern connects the varied conduct alleged in the prior complaints to the allegations made by Berkovich.

Berkovich, 922 F.2d at 1022-1023.

Likewise, the disciplinary history in this case, which the Court has reviewed *in camera*, does not rise to the level of 404(b) acts and its admission in this case would be unfairly prejudicial. Therefore, it should be precluded as evidence at trial.

## POINT VII

## OFFICER RAMOS'S PRIOR LAWSUIT AGAINST THE CITY

In 2005, Officer Ramos sued the City alleging sexual harassment relating to her assignment from August 2003 through April 2004. In 2006, Officer Ramos abandoned that lawsuit and there was a voluntary dismissal of all claims. That lawsuit has no relevance to the issues at hand, its mention may confuse the jury, and the plaintiffs should be precluded from eliciting any evidence of the fact, nature, or underlying circumstances of that lawsuit.

## POINT VIII

During their depositions, plaintiffs have referred to alleged statements by unidentified officers. One such alleged comment was, "Not you again." Defendants move to preclude any alleged statements by unidentified officers because off-the-cuff statements by officers are not admissions of any of the defendants.

Under FRE 801(d)(2), such a statement would only come in if made by an agent of a defendant. To lay an appropriate foundation to support the introduction of any statement as vicarious admissions requires a party to "establish (1) the existence of the agency relationship, (2) that the statement was made during the course of the relationship, and (3) that it relates to a matter within the scope of the agency. (case citations omitted) The authority granted in the agency relationship need not include authority to make damaging statements, but simply the authority to take action about which the statements relate. See J. Weinstein & M. Berger, Weinstein's Evidence P 801(d)(2)(D)[01] (1991)." Pappas v. Middle Earth Condo Ass'n, 963 F.2d 534, 537-38 (2d Cir. 1992).

Thus, although, another officer would not be an agent of defendants Rivera or Ramos. another officer may be an agent of defendant City. But the rule states that the statement must concern "a matter within the scope of the agency or employment, made during the existence of the relationship." 801(d)(2)(D). Off-the-cuff comments, not said for any reason furthering the business of the City, do not fall into this category. Were it the case, any party could allege unlimited admissions from an unlimited number of unidentified officers and the City would never be able to defend or call the alleged officers to the stand to deny or explain the statements. Thus, alleged random statements, made by unidentified officers for purposes outside the matters at hand in the incident, should be precluded at trial as hearsay under FRE 802.

## POINT IX

### THE COURT SHOULD BIFURCATE THE LIABILITY AND DAMAGES PHASES OF THE TRIAL

Fed. R. Civ. P. 42(b) allows the Court to bifurcate both trial and discovery where doing so would be "expedite and economize" the issues at trial. The decision to bifurcate is "firmly within the discretion of the trial court." Katsaros v. Cody, 744 F.2d 270, 278 (2d Cir. 1984). This

discretion is particularly broad in instances where a failure to bifurcate would potentially result in prejudice to a substantial right of one of the parties. 2 Weinstein Korn Miller, <u>New York Civil Practice</u>, § 603.03a.

When considering the issue of bifurcation of a trial into a liability phase and a damages phase, Federal Courts "use a case-by-case approach and consider myriad factors in determining whether bifurcation is appropriate…Those factors include, but are not limited to[:] (1) whether the issues are significantly different from one another; (2) whether the issues are to be tried before a jury or to the court; (3) whether the posture of discovery on the issues favors a single trial or bifurcation; (4) whether the documentary and testimonial evidence on the issues overlap; and (5) whether the party opposing bifurcation will be prejudiced if it is granted." <u>Guidi v. Inter-Continental Hotels Corp.</u>, 95 Civ. 9006, 2003 U.S. Dist. LEXIS 5739, at *2 (S.D.N.Y. Apr. 8, 2003) (citing <u>Dallas v. Goldenberg</u>, 143 F. Supp. 2d 312, 315 (S.D.N.Y. 2001)); <u>Lewis v. Triborough Bridge & Tunnel Auth.</u>, 97 Civ. 0607 , 2000 U.S. Dist. LEXIS 4982, at *4-5 (S.D.N.Y. Apr. 19, 2000) (finding bifurcation appropriate considering all factors). Moreover, in this determination, the moving party bears the burden of establishing that separate trials are necessary to prevent prejudice or confusion and serve the ends of justice. <u>Wechsler v. Hunt Health Sys.</u>, 94 Civ. 8294, 2003 U.S. Dist. LEXIS 13775, at *19-20 (S.D.N.Y. Aug. 8, 2003)(internal citations omitted).

<u>1. Convenience, Ease of Adjudication, and the Separation of Issues</u>

Bifurcation is appropriate when a separate trial on one claim may dispose of a necessary element of a second claim, thereby rendering the second claim moot. <u>See</u> <u>Cross v.</u> Cross, 112 A.D.2d 62, 64 (1st Dep't 1985) (separation of trials appropriate where first cause of action may render second action moot); <u>see</u> <u>Ismail v. Cohen</u>, 706 F. Supp. 243, 251 (S.D.N.Y. 1989), <u>aff'd</u>

in part and vacated in part on other grounds, 899 F.2d 1983 (2d Cir. 1990); Barnell v. Paine Webber Jackson and Curtis, Inc., 577 F. Supp. 976, 978 (S.D.N.Y. 1984) (separate trial ordered on issue of timeliness of plaintiff's EEOC complaint since trial on this issue might obviate need for any further proceedings); 9 C. Wright & A. Miller, Federal Practice and Procedure, § 2388 at 280. Bifurcation of trials is also encouraged where it will simplify or clarify issues and achieve a fair result expeditiously. 2 Weinstein Korn Miller New York Civil Practice § 603.06b; Fetterman v Evans, 204 A.D.2d 888, 889 (2d Dep't 1994); Stanford v. Resler, 206 A.D.2d 468, 469 (2d Dep't 1994).

In this case, bifurcating liability and damages will satisfy several goals. First, separating damages from liability would eliminate a number of witnesses, including experts who are being called to testify solely on the issue of plaintiffs' damages. It would also eliminate the need for the introduction of plaintiff's employment records and other records that are being introduced for the sole purpose of establishing injury. Finally, it will obviate the need to call many of the plaintiffs' family members who only testimony will go to proving injury since none of those people were present at the scene of the arrests.  Second, bifurcation will likely result in a savings of judicial time in that it will simplify and clarify the issues for the jury insofar as the jury will only need to determine whether or not the defendants violated any of their rights in a liability trial.

2. Prejudice

In addition to ease of adjudication, separate trials would also obviate the danger that evidence admissible on one issue will contaminate the minds of members of the jury in considering liability on other issues. See Pellegrino v. Walker Theatre, Inc., 127 A.D.2d 574 (2d Dep't 1987); Strauss v. Bennett Bros. Corp., 27 A.D.2d 528 (1st Dep't 1967); see also Katsaros, 744 F.2d at 278 ; Ismail, 706 F. Supp. at 251. The danger of such prejudice is particularly acute

here, where plaintiffs' alleged injuries are extensive and mostly of a psychological nature, injuries that are hard to quantify and are subject to speculative causal connections.

Moreover, bifurcation of liability and damages has been appropriate in cases, like this one, where the two phases involve different types of evidence. See Katsaros, 744 F.2d at 278 (bifurcation of trial reasonable because the two phases involve different types of evidence), cert. denied, sub nom Cody v. Donovan, 469 U.S. 1072 (1984); Ismail, 706 F. Supp. at 251 (separate trials of § 1983 claims against a police officer and the City of New York appropriate because documentary proof required by the two issues did not overlap), aff'd in part and vacated in part on other grounds, 899 F.2d 183 (2d Cir. 1990).

In the instant case, litigation of the issue of damages at trial will require the introduction of a significant amount of information that would not be relevant to the issues of liability. As stated above, plaintiffs intend to call a number of witnesses, including an expert (defendants have a rebuttal expert) and family members to attempt to prove their injuries. Accordingly, bifurcation would serve to eliminate the need for many witnesses and shorten the anticipated trial length if the jury were to find, in the first instance, that defendants were not liable. As for the witnesses who can speak to both liability and damages, the testimony from witnesses that speak to both will not be cumulative or overlap if presented in two different phases.

The posture of this case is such that, as in Guidi, cited above, bifurcation of liability and damages will not be a serious inconvenience to the Court or any party. Further, no side will be prejudiced by the bifurcation of the trial. In fact, bifurcation will keep confusing and prejudicial evidence out of the liability phase of the trial. Accordingly, defendants respectfully request that the issues of liability and damages be bifurcated and tried separately.

## POINT X

## ISSUE OF PUNITIVE DAMAGES

As shown by defendants' proportion of the joint proposed jury charge, defendants do not believe that this is a case in which punitive damages are appropriate.  On the other hand, the defendants have also stated that they have no objection to the punitives charge proposed by plaintiffs in the event that punitive damages become an issue.  Defendants do not intend to offer any evidence of the their financial ability to pay punitive damages.

On the other hand, indemnification decisions are made after trial, taking into consideration a number of elements. See, generally, Banks v. Yokemick, 214 F. Supp. 2d 401 (S.D.N.Y. 2002) (discussion of indemnification).  Moreover, regardless of whether the City has indemnified officers in the past or paid punitive damages awards in the past, that is not an indication that the City will pay an award in the future.

However, because plaintiffs concede that they have no intention of attempting to offer evidence that the City has indemnified officers and paid punitive damages awards in the past unless defendants are offering testimony of their individual ability to pay any award [Ps' MIL, D fn 1], and since the defendants have never stated that they intend to offer evidence of their financial circumstances, defendants contend that this issue is moot.

## **CONCLUSION**

For the foregoing reasons, defendants' motions should be granted in their entirety, together with such other and further relief as is just and proper.

DATED:     New York, New York
           September 8, 2008

                                        Respectfully submitted,

                                        MICHAEL A. CARDOZO
                                        Corporation Counsel
                                        *Attorney for Defendants*
                                        CITY OF NEW YORK, CARMEN RAMOS,
                                        and ANGEL RIVERA
                                        100 Church Street, Room 3-162
                                        New York, New York  10007
                                        (212) 788-9391

                                        /s_____
                                        Barry K. Myrvold, Esq. (BM6908)

TO:
Michael L. Spiegel
Scott A. Korenbaum
*Attorney for Plaintiffs*
111 Broadway, Suite 1305
New York, New York 10006
(212) 587-8558